UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| JASMINA SKOKIC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Case No. 4:19-CV-2604-SPM |
| | ) |
| | ) |
| | ) |
| ANDREW M. SAUL, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION**

This is an action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of the final decision of Defendant Andrew M. Saul, Commissioner of Social Security (the "Commissioner") denying the application of Plaintiff Jasmina Skokic ("Plaintiff") for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.*, and for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, *et seq.* (the "Act"). The parties consented to the jurisdiction of the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c). (Doc. 9). Because I find the decision denying benefits was not supported by substantial evidence, I will reverse the Commissioner's denial of Plaintiff's application and remand the case for further proceedings.

I. **FACTUAL BACKGROUND**

In her Function Report, dated November 1, 2016, Plaintiff reported having depression, memory loss, panic attacks, loss of vision, insomnia, and arm and leg weakness and pain (Tr. 204-05). She reported that her daughter has to remind her to take medication, because she forgets; that

1

she forgets dates and forgets to pay bills; that she tries to stay away from people because she is not able to listen to them, she finds their behaviors stressful, and she can " explode in a second"; that she is not able to follow spoken instructions because she cannot remember or pay attention; that she has difficulty handling stress and changes in routine; and that she fears things she did not fear before. (Tr. 205-09). At the hearing before the ALJ on August 23, 2018, Plaintiff testified as follows, through an interpreter. (Tr. 33-43). She finished a pharmaceutical college in Bosnia in 1992. (Tr. 36). She most recently worked full time in 2006, for Cardinal Health; she was fired for being aggressive and forgetting things. (Tr. 37). In 2010, she worked as a nurse assistant, and she was fired from that job for forgetting things. (Tr. 37-38). Plaintiff testified that she has trouble with forgetting things, with concentrating, with getting agitated, and with panic attacks. (Tr. 39). She also has nightmares from the war in Bosnia that make it difficult for her to sleep. (Tr. 40).

Plaintiff's medical records show that she complained of panic attacks, anxiety, and/or depression to her primary care physician in 2015 and 2016 and was prescribed psychiatric medications in 2016, including Lexapro, Cymbalta, and amitriptyline. (Tr. 422-23, 424-26, 427-29, 432-33, 435, 438, 441-42). In July 2016, Plaintiff's primary care physician made a note that the physician had been "trying to get Plaintiff to see a psychiatrist for a while now." (Tr. 484). In May 2017, Plaintiff began seeing a psychiatrist; thereafter, her records show diagnoses including post-traumatic stress disorder, panic disorder, and major depressive disorder; treatment with medications including Klonopin, Wellbutrin XL, Lexapro, and Prazosin; and appointments with a counselor. (Tr. 532-36, 541-42, 543-45, 569-73, 580-82, 583-84, 604-08, 609-13, 619, 661-62, 664-68, 670-71). The record contains Mental Medical Source Statements from Plaintiff's psychiatrist and Plaintiff's counselor, as well as assessments from a state agency psychologist and state agency physician who reviewed Plaintiff's medical records. (Tr. 465-69, 654-57, 51-58, 64-

2

71). With regard to Plaintiff's medical records, the Court accepts the facts as set forth in the parties' respective statements of fact. The Court will discuss specific records in the discussion below as necessary to address the parties' arguments.

## II.    Procedural Background

On October 20, 2016, Plaintiff applied for DIB and SSI. (Tr. 138-54). Her applications were initially denied. (Tr. 76-80). Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 84-85). On August 23, 2018, the ALJ held a hearing on Plaintiff's claims. (Tr. 31-47). On December 5, 2018, the ALJ issued an unfavorable decision. (Tr. 12-30). Plaintiff filed a Request for Review of Hearing Decision with the Social Security Administration's Appeals Council. (Tr. 134-37). On July 25, 2019, the Appeals Council denied Plaintiff's request for review. (Tr. 1-6). The decision of the ALJ stands as the final decision of the Commissioner of the Social Security Administration.

## III.    Standard for Determining Disability Under the Act

To be eligible for benefits under the Social Security Act, a claimant must prove he or she is disabled. *Pearsall v. Massanari,* 274 F.3d 1211, 1217 (8th Cir. 2001); *Baker v. Sec'y of Health & Human Servs.*, 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines as disabled a person who is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A); 1382c(a)(3)(A). *Accord Hurd v. Astrue*, 621 F.3d 734, 738 (8th Cir. 2010). The impairment must be "of such severity that he [or she] is not only unable to do his [or her] previous work but cannot, considering his [or her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such

3

work exists in the immediate area in which he [or she] lives, or whether a specific job vacancy exists for him [or her], or whether he [or she] would be hired if he [or she] applied for work." 42 U.S.C. §§ 423(d)(2)(A); 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. 20 C.F.R. §§ 404.1520(a), 416.920(a); *see also McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir. 2011) (discussing the five-step process). At Step One, the Commissioner determines whether the claimant is currently engaging in "substantial gainful activity"; if so, then the claimant is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4); *McCoy*, 648 F.3d at 611. At Step Two, the Commissioner determines whether the claimant has "a severe medically determinable physical or mental impairment that meets the duration requirement in § 404.1509, or a combination of impairments that is severe and meets the duration requirement"; if the claimant does not have a severe impairment, the claimant is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(ii); *McCoy*, 648 F.3d at 611. To be severe, an impairment must "significantly limit[] [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c), 416.920(c). At Step Three, the Commissioner evaluates whether the claimant's impairment meets or equals one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "listings"). 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *McCoy*, 648 F.3d at 611. If the claimant has such an impairment, the Commissioner will find the claimant disabled; if not, the Commissioner proceeds with the rest of the five-step process. 20 C.F.R. §§ 404.1520(d), 416.920(d); *McCoy*, 648 F.3d at 611.

Prior to Step Four, the ALJ assesses the claimant's residual functional capacity ("RFC"), 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4), which "the most [a claimant] can do despite [his or her] limitations," 20 C.F.R. §§ 404.1545(a)(1), 406.945(a)(1). *See also Moore v. Astrue*, 572 F.3d

4

520, 523 (8th Cir. 2009). At Step Four, the Commissioner determines whether the claimant can return to his or her past relevant work, by comparing the claimant's RFC with the physical and mental demands of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f), 416.920(a)(4)(iv), 416.920(f); *McCoy*, 648 F.3d at 611. If the claimant can perform his or her past relevant work, the claimant is not disabled; if the claimant cannot, the analysis proceeds to the next step. *Id.* At Step Five, the Commissioner considers the claimant's RFC, age, education, and work experience to determine whether the claimant can make an adjustment to other work in the national economy; if the claimant cannot make an adjustment to other work, the claimant will be found disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g), 404.1560(c)(2), 416.920(a)(4)(v), 416.920(g), 416.1560(c)(2); *McCoy*, 648 F.3d at 611.

Through Step Four, the burden remains with the claimant to prove that he or she is disabled. *Moore*, 572 F.3d at 523. At Step Five, the burden shifts to the Commissioner to establish that, given the claimant's RFC, age, education, and work experience, there are a significant number of other jobs in the national economy that the claimant can perform. *Id.*; *Brock v. Astrue*, 674 F.3d 1062, 1064 (8th Cir. 2012); 20 C.F.R. §§ 404.1560(c)(2), 416.960(c)(2).

## IV.    THE ALJ'S DECISION

Applying the foregoing five-step analysis, the ALJ here found that Plaintiff met the insured status requirements of the Act through March 31, 2015; that Plaintiff has not engaged in substantial gainful activity since September 1, 2010, the alleged onset date; and that Plaintiff had the severe impairments of major depressive disorder and post-traumatic stress disorder ("PTSD"). (Tr. 17). The ALJ also found that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1 (Tr. 18). The ALJ found that Plaintiff had the following RFC:

5

> [Plaintiff] has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: she should avoid workplace hazards, such as unprotected heights and moving mechanical parts; is able to complete simple, routine tasks with minimal changes in job settings and duties, and can have occasional interaction with the general public.

(Tr. 22). At Step Four, the ALJ found that Plaintiff was unable to perform her past relevant work. (Tr. 25). However, at Step Five, relying on the testimony of a vocational expert, the ALJ found that considering Plaintiff's age, education, work experience, and residual functional capacity, there are jobs existing in significant numbers in the national economy that Plaintiff can perform, including representative occupations such as floor cleaner, janitor, and laundry sorter. (Tr.25-26). Accordingly, the ALJ found that Plaintiff had not been under a disability, as defined in the Act, from September 1, 2010, through the date of the decision. (Tr. 26).

## V. DISCUSSION

Plaintiff challenges the ALJ's decision on three grounds: (1) the ALJ failed to properly weigh the opinions of Plaintiff's treating mental health providers; (2) the RFC is not supported by substantial evidence; and (3) the ALJ's analysis of Plaintiff's subjective complaints is confusing and mischaracterizes the evidence.

### A. Standard for Judicial Review

The decision of the Commissioner must be affirmed if it "complies with the relevant legal requirements and is supported by substantial evidence in the record as a whole." *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (quoting *Ford v. Astrue*, 58 F.3d 979, 981 (8th Cir. 2008)); *see also* 42 U.S.C. §§ 405(g); 1383(c)(3). "Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "Substantial evidence is

less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Pate-Fires*, 564 F.3d at 942 (quotation marks omitted). *See also Biestek*, 139 S. Ct. at 1154 ("Substantial evidence . . . means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'") (quoting *Consolidated Edison*, 305 U.S. at 229).

In determining whether substantial evidence supports the Commissioner's decision, the court considers both evidence that supports that decision and evidence that detracts from that decision. *Renstrom v. Astrue*, 680 F.3d 1057, 1063 (8th Cir. 2012). However, the court "'do[es] not reweigh the evidence presented to the ALJ, and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reasons and substantial evidence.'" *Id.* at 1064 (quoting *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006)). "If, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." *Partee v. Astrue*, 638 F.3d 860, 863 (8th Cir. 2011) (quoting *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005)).

### B. The ALJ's Evaluation of the Opinions of Plaintiff's Treating Mental Health Providers

Plaintiff's first argument is that the ALJ did not properly evaluate the opinions of Plaintiff's treating mental health providers: Dr. Mirela Marcu, Plaintiff's psychiatrist, and Maggie Santinanavat, M.S.W., L.C.S.W., Plaintiff's counselor.

Dr. Mirela Marcu was the attending physician for at least five of Plaintiff's treatment sessions at the SLUCare Department of Psychiatry, spanning the time frame from May 2017

through May 2018. (Tr. 520-26, 532-36, 569-73, 580-84, 604-19).[1] On July 5, 2018, Dr. Marcu completed a Mental Medical Source Statement for Plaintiff. (Tr. 465-69). She noted that Plaintiff's diagnoses were major depressive disorder, severe, recurrent; PTSD; and neurocognitive dysfunction. (Tr. 469). Dr. Marcu opined that Plaintiff would have limitations much more severe than those reflected in the RFC, including, *inter alia*, marked limitations in the ability to initiate and complete tasks in a timely manner, to ignore or avoid distractions, and to sustain ordinary routine and regular attendance; extreme limitations in the ability to follow one- or two-step oral instructions to carry out a task; and marked limitations in the ability to keep social interactions free of excessive irritability, argumentativeness, sensitivity or suspiciousness. (Tr. 465-68). Dr. Marcu also opined that Plaintiff's pace of production would be 31% or more below average; that she would miss work due to psychologically-based symptoms three or more days a month; that she could not perform in proximity to coworkers without being distracted by them or without distracting them due to exhibition of abnormal behavior; that she could not consistently perform for supervisors without exhibiting insubordinate behavior in response to supervisors; and that she could not perform in a setting with any contact with the general public. (Tr. 465-68). Asked what objective signs and symptoms supported her opinion, Dr. Marcu wrote that Plaintiff had severe depression, severe memory and concentration issues, and inability to function independently. (Tr. 469).

Maggie Santinanavat, M.S.W., L.C.S.W., was Plaintiff's therapist, to whom Plaintiff was referred by her psychiatrist in 2018. Ms. Santinanavat provided counseling to Plaintiff on three occasions prior to offering an opinion about Plaintiff's impairments, and on at least one occasion

---

[1] It appears that much of Plaintiff's treatment at these visits was provided by resident physicians, with Dr. Marcu supervising. The parties appear to agree that Dr. Marcu is considered a treating physician.

thereafter. (Tr. 661-62, 664, 667, 670). On July 26, 2018, Ms. Santinanavat, MSW, LCSW, completed a Mental Medical Source Statement for Plaintiff. (Tr. 654-57). In her opinion, Ms. Santinanavat noted that Plaintiff's diagnoses were major depressive disorder, recurrent, severe; and PTSD. (Tr. 656). Ms. Santinanavat opined that Plaintiff would have limitations similar to those reflected in Dr. Marcu's opinion. (Tr. 654-57). Asked what objective signs and symptoms Plaintiff had displayed that supported her opinion, Ms. Santinanavat noted that Plaintiff reported daily crying spells and noted that Plaintiff had never recovered from her trauma from the war (including memories of witnessing her parents and siblings being shot to death by soldiers). Ms. Santinanavat also noted severe anhedonia, fatigue, isolation, lack of motivation, poor memory, poor concentration, inability to make decisions, and increases in panic and anxiety. (Tr. 657).

Under the regulations applicable to Plaintiff's claim, Dr. Marco is considered a "treating source" whose opinion must be evaluated pursuant to 20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2).[2] These regulations provide that if Social Security Administration finds that a treating source's medical opinion on the nature and severity of a claimant's impairments "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record," the Social Security Administration will give that opinion "controlling weight." *Id.* When the ALJ does *not* give a treating physician's opinion controlling weight, the ALJ must evaluate the opinion based on several factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, the evidence provided by the source in support

---

[2] These regulations apply to claims filed before March 27, 2017. For claims filed after March 27, 2017, the rule that a treating source opinion is entitled to controlling weight has been eliminated. *See* 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Because Plaintiff's claim was filed in 2016, the Court will apply the version of the regulations that applies to claims filed before March 27, 2017.

9

of the opinion, the consistency of the opinion with the record as a whole, and the level of specialization of the source. 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6). The ALJ may discount a treating physician's opinion where, for example, "other medical assessments are supported by better or more thorough medical evidence," *Goff*, 421 F.3d at 790 (internal quotation marks omitted), or the opinion "is inconsistent with the physician's clinical treatment notes," *Davidson v. Astrue*, 578 F.3d 838, 843 (8th Cir. 2009). "When an ALJ discounts a treating physician's opinion, [the ALJ] should give good reasons for doing so." *Davidson v. Astrue*, 501 F.3d 987, 990 (8th Cir. 2007) (internal quotation marks omitted). *See also* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's medical opinion.").

As a licensed clinical social worker, Ms. Santinanavat is not considered an "acceptable medical source," and thus her opinion is not subject to the same rules as treating physician opinions. *See, e.g., Sloan v. Astrue*, 499 F.3d 883, 888 (8th Cir. 2007) (citing Social Security Ruling 06-03p, 2006 WL 2329939 (Aug. 9, 2006)). However, opinions from sources such as licensed clinical social workers "are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." SSR-0603p, 2006 WL 2329939, at *3. They are to be evaluated using the same factors as those used to evaluate treating physician opinions that are not given controlling weight. *Id*. at 889. *Id.* at *4. The adjudicator generally should explain the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case. *Id.* at *6.

Here, the ALJ did not specifically state what weight, if any, he gave to either Dr. Marcu's opinion or Ms. Santinanavat's opinion. The ALJ also did not expressly discuss the regulations or factors discussed above. The ALJ's decision contains two statements that appear to contain an evaluation of these opinions:

> The opinions the claimant provided are based almost solely upon her self-reports. She reported some improvement when her medication management was combined with psychotherapy, but these opinions suggest her condition without treatment or therapy was virtually the same as her condition with medication management and therapy. She did not require hospitalization. She did not require intensive outpatient or medication management. She was only seen every few months and her medication regimen remained relatively unchanged. . . .

(Tr. 21).

> The claimant provided opinions from a psychiatrist and a therapist indicating the most severe options on the checklists. Each opinion was provided after two or three sessions and were based upon her self-reports of symptoms. The level of treatment recommended is inconsistent with symptoms reported in the opinions. When asked for objective signs or symptoms supporting these opinions, there was no response.

(Tr. 24).

Several of the ALJ's statements do not appear to be supported by the record. First, although Ms. Santinanavat's opinion was provided after only three counseling sessions, Dr. Marcu's opinion was not provided after "two or three sessions," but after five visits.

Second, it is not clear why the ALJ concluded that these opinions were based "almost solely upon [Plaintiff's] self-reports." Notes from visits to Dr. Marcu and other psychiatrists consistently contain numerous objective signs and symptoms supportive of the opinions, including findings that she appeared older than her stated age or was disheveled (Tr. 524, 545, 571, 582, 606); that her eye contact was intermittent (Tr. 524, 534); that her speech was soft (Tr. 524, 534, 545, 571, 582, 606), that she showed psychomotor retardation (sometimes mild) or restlessness (Tr. 524, 534, 571, 582, 606); that her affect was sad, restricted, dysphoric, tired, and/or tearful (Tr. 524,

11

534, 544-45, 571-72, 582, 606); that her mood was depressed or "not good" (Tr. 524, 534, 545, 571, 582); and that her thought content had phobias (Tr. 524, 534, 545, 571, 582, 606). Ms. Santinanavat's notes also contain numerous objective signs and symptoms, including findings of poor eye contact, a guarded attitude; a depressed, sad, low, and anxious mood; a flat or constricted affect; delayed and soft speech; thought content showing helplessness, low self-worth, and hopelessness; and impaired concentration. (Tr. 662, 665, 670-71).

Third, contrary to the ALJ's statement that Plaintiff's "medication regimen remained relatively unchanged," Plaintiff's medications were changed at every (or nearly every) psychiatric visit. On May 25, 2017, her amitriptyline was continued, her Lexapro prescription was increased to 20 mg, and Klonopin was added to help with panic attacks; it was also noted that she might benefit from CBT (cognitive behavioral therapy). (Tr. 525). On July 13, 2017, Plaintiff's amitriptyline was stopped, she was started on Seroquel 50 mg for insomnia and bad dreams, she was continued on Lexapro 20 mg and Klonopin, and it was noted that she would benefit from therapy. (Tr. 535). On September 28, 2017, Plaintiff's Seroquel was discontinued, and she was started on Prazosin; her Klonopin was increased, and her Lexapro was continued. (Tr. 545). On October 26, 2017, her Lexapro and Klonopin were continued, her Prazosin was increased to 2 mg, and Wellbutrin XL 150 mg was added. (Tr. 572). On January 25, 2018, Plaintiff's Wellbutrin XL prescription was increased to 300 mg, and her Prazosin prescription was increased to 4 mg nightly; her Lexapro and Klonopin were continued. (Tr. 583). She was also referred to neuropsychological testing for evaluation of her cognitive defects, and it was noted that traumatic brain injury could not be ruled out as a cause of her memory issues. (Tr. 584). On May 10, 2018, Plaintiff's Lexapro and Prazosin were continued, Plaintiff 's Wellbutrin XL was increased to 450 mg, and Plaintiff's Klonopin dose was increased. (Tr. 608). She was advised to get neuropsychological testing as soon

as possible to evaluate her memory problems. (Tr. 608). It was noted that thy would "consider ECT (electroconvulsive therapy) in the future is [sic] prove refractory." (Tr. 608). These records tend to support the opinions offered, because they show that Plaintiff's psychiatrists were constantly changing and increasing her medications; they do not suggest a situation in which Plaintiff's "medication regimen remained relatively unchanged."

Fourth, it is unclear why the ALJ found the level of treatment recommended was inconsistent with the symptoms reported in the opinions. Although the ALJ correctly noted that Plaintiff had not been hospitalized, she underwent significant and increasingly intensive interventions for her mental problems: she was referred to a psychiatrist by her primary care physician; she was prescribed ever-increasing numbers and dosages of psychiatric medication by her psychiatrists, she was referred to a therapist and underwent therapy; she was referred for a neuropsychological evaluation; and it was noted that electroconvulsive therapy would be considered in the future if her symptoms proved refractory.

Fifth, contrary to the ALJ's statement that these providers gave "no response" when asked for objective signs or symptoms supporting their opinions, a review of Dr. Marcu's opinion shows that on the portion of the form asking for objective signs and symptoms, she noted depression, severe memory and concentration issues, and inability to function independently. (Tr. 469). Similarly, a review of Ms. Santinanavat's opinion shows that she answered that question by noting, *inter alia,* severe anhedonia, fatigue, isolation, lack of motivation, poor memory, poor concentration, inability to make decisions, and increases in panic and anxiety. (Tr. 657)

In light of the above, the Court cannot say that the ALJ gave good reasons, supported by substantial evidence, for the decision to discount or disregard the opinion of Dr. Marcu, nor is it apparent that the ALJ properly considered the opinion of Ms. Santinanavat. Moreover, the Court's

13

own review of the record shows that this is not a situation where the treating physician's opinion "is inconsistent with the physician's clinical treatment notes," *Davidson v. Astrue*, 578 F.3d at 843. Dr. Marcu's and Ms. Santinanavat's opinions appear to be, at least to a significant extent, consistent with their treatment notes. As discussed above, the relevant treatment notes contain numerous significant objective findings with regard to Plaintiff's mental condition, and the regularly changing and increasing dosages of prescription medication and discussions of more options such as electroconvulsive therapy are consistent with their opinions regarding Plaintiff's very severe mental conditions. In addition, this is not a situation in which it is apparent that the ALJ discounted these opinions because "other medical assessments are supported by better or more thorough medical evidence," *Goff*, 421 F.3d at 790. The only other opinion evidence in the record relevant to Plaintiff's mental limitations is the opinion of non-examining state agency psychologist on-examining state agency consultant, Dr. Steven Akeson, Psy.D., who reviewed Plaintiff's medical records at a time that predated most of the treatment notes related to Plaintiff's mental health condition. (Tr. 52, 57). It is not clear why the ALJ would have given more weight to that opinion than to those of the specialists who treated Plaintiff on an ongoing basis.

Because the Court finds that the ALJ did not give good reasons, supported by substantial evidence, for the decision to discount or disregard the opinion of Plaintiff's treating psychiatrist, the Court will remand the case for further proceedings. *See Anderson v. Barnhart*, 312 F. Supp. 2d 1187, 1194 (E.D. Mo. 2004) ("Failure to provide good reasons for discrediting a treating physician's opinion is a ground for remand"); *Clover v. Astrue*, No. 4:07CV574-DJS, 2008 WL 3890497, at *12 (E.D. Mo.Aug.19, 2008) ("Confronted with a decision that fails to provide 'good reasons' for the weight assigned to a treating physician's opinion, the district court must remand.");

*Knebel v. Astrue*, No. C12–0015, 2014 WL 7384944, at *11 (N.D. Iowa Dec. 29, 2014) (remanding because "the ALJ failed to give 'good reasons' for rejecting" treating source opinions).

The Court acknowledges that the limitations in both Dr. Marcu's and Ms. Santinanavat's are quite extreme, and it is certainly possible that the ALJ could reasonably find that not all of the limitations in those opinions are supported by the treatment notes, and/or that some of them are inconsistent with other substantial evidence in the record. However, the current decision does not make it clear to the Court that the ALJ properly weighed those opinions in a manner consistent with the regulations and case law discussed above. On remand, the ALJ should re-evaluate these opinions under the relevant factors, state what weight is given to them, and support those evaluations with evidence from the record.

Because the reevaluation of these opinions on remand will likely affect the ALJ's evaluation of Plaintiff's RFC and Plaintiff's subjective complaints, the Court will not address Plaintiff's remaining arguments,

## VI. CONCLUSION

For the reasons set forth above, the Court finds that the decision of the Commissioner is not supported by substantial evidence. Accordingly,

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the decision of the Commissioner of Social Security is **REVERSED** and that this case is **REMANDED** under 42 U.S.C. § 1383(c)(3) and Sentence Four of 42 U.S.C. § 405(g) for reconsideration and further proceedings consistent with this opinion.

                                                          SHIRLEY PADMORE MENSAH
                                                          UNITED STATES MAGISTRATE JUDGE

Dated this 18th day of September, 2020.